And we'll hear counsel in USA v. Muzaffar et al. Go ahead, Ms. Van Ness. Good afternoon. I'm representing Irfan Muzaffar. And since there are three related appeals before you today, I just want to make clear that he is Nadim's son, and he's clearly the least culpable defendant before you today. The other two defendants were convicted of multiple counts of mail and wire fraud and money laundering and bribery, as well as the structuring offenses, but Irfan was only convicted of the structuring offenses. In the interest of time, I'm going to rest on my brief with respect to points one and two, the sufficiency argument and the fair trial point. And I'm going to turn my attention to the forfeiture argument. As you know, the argument is that the court below erred in attributing the full $4.3 million to my client. The $4.3 million is the amount of checks under $10,000 that were cashed at Pacific during the entire life of the structuring crime, many-year period. The court based this attribution of the entire amount on a finding that my client had been in the family business since 2004, and therefore he was around for the entire period that the structuring occurred. What was the family business again? His father ran a construction business who performed services for the school housing authority or school construction authority, sorry. It seems like the district court was sympathetic to your client's plight in concluding that the amount of the forfeiture should be substantially less than the amount sought by the government. You appear to claim that as a matter of law, there was a ceiling here that was exceeded by the district court's ruling. Well, I have two arguments, Your Honor. One is that attributing the full $4.3 million to my client as the benchmark from which you could work down under the Eighth Amendment was an error, and that it was based on the finding that he'd been in the family business for that period, and that's where the judge started, and I'm saying that was erroneous. Among other things, the court ignored evidence in the record that Irfan was in Pakistan for substantial periods of time during all these years, that he did not work in the office on any regular basis until sometime in 2009, and then he held a very lowly position. He was running errands. He was answering the phone. He subbed for the office manager when she was out. He didn't even have a desk in the office, so he just basically did errands as he was directed to do. I also want to point out that Mr. Singh, who was the cooperating witness, who was tasked in recording, you know, wearing a wire and recording incriminating conversations with all the defendants when he became a cooperator, he testified that he did most of the runs specific to cash the checks, and that Irfan's brother, Adnan, who was never charged, made some of them, and he said that he had to call his contact at Pacific, Adnan, every time he sent one of the sons to Pacific, and he volunteered on his examination that he only made calls to Adnan that Irfan was coming a couple of times. Now, that testimony was stricken from the record as nonresponsive to the question posed, but since we're talking about a sentencing liability here, it's clearly reliable testimony, and I ask the court to consider that. So we have a very sparse record in actuality that Irfan had any knowledge of the course of this destruction activity, and certainly there is no basis to find that he should be charged with the full amount. I also want to point out one more thing on page 155 of our appendix, and it's quoted in the government's brief on page 55. The court had made findings about Irfan's knowledge of what was going on, even though he wasn't charged with the fraud or money laundering, and so that's in the middle paragraph of the government's brief, page 55. I want to point out that every single thing the judge focused on there was based either on this June 2012 recordings that the cooperator made or the one occasion on which Irfan was actually seen going to Pacific to cash checks, and that was in July of 2011. So those were very late in the conspiracy. It was concluded, I believe, in May 2012. So that evidence that the judge cites as if it was demonstrated that my client was aware of all these activities going on for an extensive period of time is actually not true. So that's our first point, that the court erred in attributing the full amount to Irfan. As the court knows, as we've stated in our brief, latecoming conspirators are liable only for amounts that they are in the future that are reasonably foreseeable to them or with respect to past amounts that it's reasonably shown they were aware of. And I don't think that finding has any support here that $4.3 million is something that my client should be held accountable for. The $4.3 million was the whole thing? Yes, on page 7 of my brief. Is it 7? Page 5, I'm sorry, Your Honor. There were these 537 checks that were cashed between the beginning of 2007 until mid-May 2012, and all of those checks were under $10,000, so that's for the entire course of the conspiracy. And I also point out that the government has the burden of proof of showing that my client should be held responsible for this entire amount by a preponderance, and I don't think that burden was met. Just a very small point, since you mentioned the appendix. Am I right your brief cites some pages from the transcript that are not in the appendix? Is that correct? I don't think so, Your Honor. You put them all in the appendix. Well, I put all the ones that were material. I didn't put them all. No, the ones you cited. I didn't cite every single page. No, I understand that. I'm going to try it again. Did you put in the appendix whatever pages you cited in your brief? Yes. You did. Okay. Again, there are pages in the transcript that I cited. Because somebody didn't, so I just wasn't sure if it was you or some of the others. Not all the pages that were cited by all three of you are in the appendix. Well, some of the pages I cited I didn't put in the appendix for peripheral matters like Nadim's involvement in the case. It was only the one I put in. As you may know, the appellate rule says that any material cited in the brief should be in the appendix. All right, Your Honor. Well, I have misunderstood that rule for many years because this is a very long transcript, and much of it was undisputed and had nothing to do with my client. Then fine. Then you don't have to cite it. If they're undisputed, you don't have to cite them. You can just tell us here's an undisputed fact. But the minute you tell us there's a record reference and you call our attention to it, some of us go looking for it. Okay. I apologize if I did that. All of us do, usually. One more thing I want to make. You've reserved some time. We'll hear further from you later. Mr. Ricco? Yes. Good afternoon, Your Honors. Your Honor, I think I may be that guilty party, and I think I sort of misinterpreted the rule the same way which my colleagues did, and I certainly apologize to the Court for that. If I may, I want to focus in on the two issues raised. I was not the trial lawyer in this case. I went about the task of reviewing the record and seeing it was there. This was a case where a defendant made what I consider a routine application for severance, and it was denied in a way which is often the practice in district courts. However, what became clear, and the reason why so much of the testimony was laid out in the brief, is that the statement of Zaid Saeed, his post-arrest statement, which was modified with the use of colleague, really made a reference directly to Muzaffar Nadim, and I believe in this case should have been a basis for severance. The testimony of the main government cooperator was that Mr. Nadim was the boss, that he ran these companies, that the companies were shell companies, and that he was responsible for the bidding, the contracting, the certified payroll receipts, the prevailing wages, and that was corroborated by the post-arrest statement of Zaid that was sanitized. There was no other person on trial or mentioned during the course of this trial that it could have referred to other than Mr. Nadim. What was significant, and I don't think would have been available to the lawyer to argue at the time, was that at the trial, it became clear that an informant was used, and that the informant went about over several months and do many recordings, and an attempt to memorialize or corroborate these allegations, and there were none. There were none with respect to the informant. Did trial counsel suggest some other word other than colleague that they wanted used? No, they did not, Judge. They did not suggest any other word. When I look at this record, I was not the trial lawyer, so I wish I had been the trial lawyer. The term used didn't point to anyone other than Mr. Nadim, and that's why the issue was raised for appeal. On appeal, with respect to the cooperation and the lack of the other types of evidence that would corroborate the cooperating witnesses' testimony, the recorded conversations, did not substantiate or corroborate it at all, particularly with respect to the prevailing wage. At the time of the government's closing arguments, the government essentially argued that everything that Mr. F's statement, they heard right there on the witness stand from Mr. Singh, who was the cooperating witness, and that's in fact the type of danger that should be avoided in a joint trial where the defendant does not have an opportunity to cross-examine really the most significant piece of cooperating evidence against him, which was the co-defendant's statement.  Your Honor, with respect to the remaining issue related to the crossing of the line of the expert testimony, this was a case of money laundering and structuring, but the structuring wasn't really terribly sophisticated. Your Honor's already heard it. There were tons of checks that were taken to this check cashing place, all underneath the statutory amount. Specifically, during the trial, there were these three transactions that took place in June of 2012. The jury would be instructed on structuring, how it operated. This was not necessarily the type of case that required an expert testimony. These checks were all under the amounts. The testimony was that they were placed under the amount for the purposes of . . . that attention would be drawn, and the cooperator testified that the checks were therefore then drawn at a lesser amount. In this case, the expert testified that . . . and he gave an example of structuring. He said, well, if there's a $20,000 check and it's divided in three ways, and each one of those ways is under $10,000, that's structuring. One of the lawyers objected. Mr. Nadim's lawyer didn't object. I think one of the lawyers for the co-defendant objected. He joined the objection. The judge chided the government a little bit and said, you know, you're getting awfully close here. In my view, it wasn't a question of close. He instructed the jury at what structuring was. The condition of the element was established by the expert witness in a case where it was absolutely not necessary. Given the amount of checks and the testimony that was given at trial. Those are the two issues raised by Mr. Musafat Nadim. Thank you. Thank you, Mr. Rucco. We'll hear from counsel for Syed. Mr. Tameo. Thank you, Your Honor. My name is Peter Tameo, and I represent Mr. Syed. And I'll have to start out by acknowledging to Judge Newman that I am also at fault for not following the rule. I will go back and check it. I thought that when there was a CJA that we weren't supposed to actually include the pages. But I'll double check that, and I apologize for not including the pages in the appendix. Although, frankly, I often wonder what these single pages, the value of these single pages, because the context can go on for pages on either side. But I'll make sure I follow the rule from here on out. With regard to our case, Your Honors, I'd like to focus on the sufficiency of the evidence on the illegal payments involving my client. Because this is a case in which the prosecution carefully structured the evidence. And they structured the evidence to cover up what they didn't have with what they appeared to have. Reminds me of the old ways that we used to handle pop quizzes in high school. And you hadn't realized, Professor, I don't remember the War of 1812, but let me tell you about the Revolution. So that's what they did. And in this case, when you get to the issue of illegal briberies and illegal payments to the union official, that's what happened here. The prosecutor ably says in his brief, oh, we have all this evidence. But what does the evidence show? The evidence shows what isn't disputed, that payments were made by the cooperating witness to the undercover inspector and also to the union official. And that my client, Mr. Sayed, was present when some of these payments were discussed. And that on occasion he gave the money over to the cooperator for the payment. But what's missing is his state of mind, is his mens rea. Did he have the requisite knowledge and intent? And it's gone. And this was objected. This was an issue at trial. This was missing from the record. The analogy I like to use is one of the bank teller. And imagine two people walking up to the bank teller and asking the bank teller to cash a $5,000 check because the payments were $5,000. We don't have to deal with structure. The bank teller gives them the money. Well, nobody sitting here is going to say that the bank teller was guilty of a crime. But the bank teller facilitated the crime. But for giving the money, the payment would not be made. Now, let's suppose those two individuals in the presence of the bank teller were discussing how it was going to be made. Sorry, how the money was going to be used. Well, the bank teller has her own job. The bank teller is preparing the accounts. And the bank teller is not necessarily paying attention. That's exactly what was going on here. You don't see Mr. Syed engaging in a discussion with Mr. Singh, the cooperator. The cooperator doesn't say he has a discussion with him. He just says he's there. And he's there in a small trailer-type construction business office. There's a number of desks. They share the desks. They share the computers. There's a lot going on. And on time, he may be present. But what's missing and what the government doesn't ask Mr. Singh is, did you speak to my client about the purpose of this money? Now, the one thing that they will say is that when Mr. Singh is, I'm sorry, when Mr. Syed is arrested, he says he's aware of the payments. But the payments took place years before. The payments to the undercover inspector were two years before his arrest, and the payments to the union official was the year before. We don't know from that statement what was said, what he knew at the time. And that's critical to the sufficiency of the evidence. In my last few seconds, let me just point out that we also think the district court, by not giving a hearing on the statement itself, there's no dispute in the record that Mr. Syed was questioned before getting his Miranda warnings. There's no evidence as to what he was questioned about other than the statement of his attorney, which he says he was questioned about the crime. And Judge Kogan says, I'm going to accept that. I'm not going to argue that it couldn't be out of, because it's not in Mr. Syed's affidavit. And the prosecutor volunteers, well, all they asked him about was pedigree. But there's no statement from any, the arresting officer. Any arresting officer never testifies. The arresting officer is not the officer who takes the subsequent statement. So they've kind of created this nice little cocoon in which they've kept that from coming out. And that's never produced in discovery. It's never produced in the record anywhere. I've been able to find it. Of course, I wasn't the trial attorney. On other issues, I'll stand on our brief, and I think I've reserved a couple moments to come back. You have. Thank you. Thank you. Good afternoon, Your Honors. My name is Nathan Riley, and I represent the government in this matter. May it please the Court, I think I'll take in turn a number of the arguments that have been raised by counsel. With respect to the issue of severance that counsel for Mr. Nadeem raises, I think there's a few points that I would quarrel with. I think the notion that Mr. Syed's confession as brutalized was solely substantiated or corroborated by the cooperator Meninder Singh's testimony is simply not accurate. What was the phrase you used? Brutalized? Yes. Yes, Your Honor. I hadn't heard that one. It was like brutalized. Well, from some point of view, that may be what happened. But I think that that's simply, it's not a fair representation of the record. There were ample documentary evidence, including the PACE admissions that were sent to the School Construction Authority, in which Mr. Nadeem submitted notarized signatures in which he agreed, for instance, to abide by the prevailing wage law. There was the testimony of one of his accountants, Pio Andreotti, who said that Mr. Nadeem was the individual who had set up the shell companies through which all of the structured cash came. That's in addition to the testimony from Mr. Singh. And unlike counsel for the appellant, I had the fortune or misfortune of being trial counsel in this matter and was there for the four days that Mr. Singh was on the stand, including substantial cross-examination. So his testimony was strongly tested. I also note that, and Your Honor, I confess that the government also realized late in the game that the testimony from Agent Hughes, who had represented, who had put in Mr. Syed's testimony, was not part of the record. We've actually brought copies here today. But I do note that while there was a dispute at the time of— It was part of the record, but not the appendix. Yes, I'm sorry. Yes, Your Honor. So I note that while there was back and forth at the pretrial hearing with respect to how this statement could be brought into conformity with the confrontation clause, that it was not objected to when it went into the record. One other piece to that, and again, I apologize that the Court doesn't have the paper in front of him, although we will certainly make it available. I note that with respect to Judge Kogan's finding that there was not sufficient evidence put— or not sufficient basis of dispute with respect to Mr. Syed's claim that he should be— that there should be a suppression hearing with respect to his statement. I note that, one, at the time there was no effort by he or his counsel to supplement the record. I also know that while there was no testimony by the arresting agents at either any hearing or subsequently at trial, and Agent Hughes clearly indicates that he was not present when Mr. Syed was initially arrested, he does note that the arresting agents were not familiar with the case and thus were not in a position to ask substantive questions about the—about anything relating to Mr. Syed's conduct simply because they didn't have any knowledge about the case. So we believe that Judge Kogan appropriately found that there was not a basis for a hearing on that particular matter. With respect to the sufficiency for Mr. Syed, I'd like to direct the Court's attention to the government's appendix to pages 106 and 107, where I think it belies the idea that Mr. Syed was merely present. There is discussion—there is testimony from Meninder Singh about Mr. Syed being present while there is a discussion for the purpose of a bribe being paid to the individual who, unbeknownst to the co-conspirators, was an undercover agent. Beyond that, on GA107, there is subsequent discussion about Mr. Syed handing over the money in connection with the bribe. So I think if you are present at a conversation and a participant in a conversation where we are talking about the purpose for a bribe to a government agent, and then you hand the money over, that that certainly withstands the basis of sufficiency for a conviction, Your Honors. Your Honor, to touch briefly on the district court's finding with respect to Irfan Musafar and with respect to the forfeiture, I think it's significant to note that the trial record made clear that this was a family business. While there were multiple individuals who were employed on the various job sites in actually engaging in construction, the actual day-to-day sort of back-office function was a relatively closely—close-knit family, for lack of a better term. It was—Musafar Nadim was clearly the boss. Meninder Singh, the cooperating witness. Zanul Syed was essentially the right-hand man of Meninder Singh. There was a bookkeeper whose name was referenced throughout the trial as Shami. And then Mr. Nadim's sons participated from time to time. I raise that only because I think the idea that it was not foreseeable or that Judge—more appropriately, that Judge Kogan erred in finding that it was foreseeable that Irfan Musafar was aware of the scope of this operation. All—SM&B, the construction company—all they did was school construction authority work, which necessarily included certified payrolls and, given the scope of the fraud, necessarily required a river of cash to go through to pay the workers who were working illegally and being paid cash on a weekly basis. So while no one disputes, and I think the sentencing minutes make clear, no one suggested that Irfan Musafar was the mastermind, that he was the key player, that he was moving the chess pieces. Everyone understood that he was a pawn that—who was being moved by his father. But the idea that he was somehow a one-off actor is, I think, not consistent with the weight of trial evidence, which comes from Meninder Singh. The government readily acknowledges that the specific instances of which there were—that were put in the record of trial, which were the surveillance in, I believe it was June or July of 2011, when Irfan Musafar went to the check-cashing location and the subsequent recording in 2012, where he participates in a conversation in which there is a discussion about what you would do if the police stopped you with a lot of cash. And I think that's worth noting as well. I understand that it happened at the tail end of the conspiracy, but it is worth noting that there's not a shock and horror from Irfan Musafar. There's not a, what do you mean? What would I do? Why would the police stop me? What would you mean? We would have to explain it. There is a—he is a willing participant in a conversation about how to conceal these matters from the police. And in fact, there is a statement by Mr. Syed in which he says, you know, it would be fine if we were doing private construction because you can pay those guys in cash, but we're doing government work, so, you know, that's why the cash is a problem. For all of these reasons, Your Honor, the government's position is that the appellant's motion should be denied and that the government's—excuse me, that the district court's judgment and sentence below should be affirmed. Can I take just a second to ask you about our holding in the Velosky case regarding forfeiture claims? Yes, Your Honor. Would you address that briefly? How does Velosky inform a decision in this case? Your Honor, I believe that Velosky informs sort of the—or is layered essentially on top of the Bajikadzian decision. And I think effectively sort of almost layers on a 3553A-like inquiry into the forfeiture determination. And I think that's what Judge Kogan attempted to engage here. He made the finding, which I understand is disputed by counsel, but he made the finding that the $4.3 million was foreseeable to Irfan Musafar. And then he attempted to engage the issue as to not only Mr. Musafar's respective role and the Bajikadzian factor, but also the nature of what his ability to pay would be. And so I think—I don't believe that Judge Kogan's determination was in contrast to that case. I think that it's—there is an extent to which it is a—it introduces, I think, as I said, sort of a balancing test or at least a measure to which a lot of factors are considered. And we believe that it was consistent with that. And how would that—but how would you support an order of forfeiture of $1 million? Your Honor, I think that it's the— Do you have any notion here on the record of what his ability to pay is? Is this just a fruitless application of the forfeiture statute? So, Your Honor, and let me draw a distinction between Mr. Syed and Mr. Irfan Musafar, the son. I believe that the likelihood, quite frankly, of recovery with respect to Mr. Syed is quite slight. And the reason I say that is not only the record before the Court, which—and the trial record, which was that Mr. Syed's principal profit was in the form of his continued employment and a vehicle, but not through substantial takings from the illicit profits. Also, Mr.—it is my understanding Mr. Syed is in immigration proceedings at this point, so faces the very real possibility of removal to his native country of India. With respect to Irfan Musafar, I think the Court took into consideration the fact that while— Now, there you had a $750,000 forfeiture. Yes, Your Honor. And there I think that, again— He has no high school degree, no meaningful employment. Isn't that right? Correct, Your Honor. I think that the— Why wouldn't a forfeiture order of this sort weigh heavily against a for— given his inability to pay it, what seems to be a clear inability to pay it, why doesn't that weigh against such a claim? Well, Your Honor, I think that there's—that no one factor is determinate, and so I think it's significant that the Court engaged in this—in the weighing of the various Bajor-Qajian factors. And I think considered on one hand the lack of educational background and lack of current employment at that time, Mr. Musafar, against the fact that unlike, for instance, defendants that come before the district court and whose appeals end up here frequently, he had strong family support. He had a family which, although obviously significantly encumbered by the forfeiture order against Mr. Nadeem, had assets both here in the United States and in Pakistan. He's also a relatively young man, and so had the prospect of future employment, and I think felt that it was significant to say, although I don't believe for various reasons, including your current willingness to pay, your relative role in the crime, and many other things, I'm going to substantially reduce what I believe would otherwise be an appropriate forfeiture amount, but I'm not prepared to sort of, for lack of a better term, let you walk away free, because I think you did play a significant role in a serious crime, and that you—that it's appropriate that you pay some forfeiture. What's the status of each of these defendants now? So, Your Honor, Mr. Nadeem remains incarcerated at this time. Mr. Syed, as I understand, I believe remains in immigration proceedings, and I believe is in immigration custody, and Mr. Moussavar has completed his sentence, and in fact I believe he may be present in court. So that's the status with respect to these individuals. Okay. Thank you. Ms. Van Ness, you've reserved some time. Yes, Your Honor. The case, the Velosky case, I think is the name of it, actually post-stated the sentencing here. To the extent that the district court did try to think about how this would impact on my client's future ability to make a living, I think that he wasn't directed to, and also he expressed a hope that Irfan would be able to meet this judgment, but I think the number was sort of pulled out of thin air. The idea that a high school dropout who has no meaningful employment history except through his father, who now has a felony conviction, who cannot live rent-free in his father's house anymore because the house is going to be sold as part of the forfeiture judgment, and who has a wife and two young daughters to support, is clearly not a great prospect for making a large amount of money in the future. And so I think that's very telling, and that that's one of the reasons why we believe this forfeiture amount is constitutionally excessive. I also want to point out the disproportionality between three-quarters of a million in forfeiture that was levied against Irfan, who had very little to do with this entire scheme, versus $1 million that was assessed against Mr. Syed, who was convicted of nine counts and was involved in the entire fraud and money laundering aspect and bribery aspect of the case. It's another factor that was not paid any attention to by the district judge. Thanks very much, Ms. Fenton. Mr. Tomeo, you reserve some time. First of all, let me start by bringing up to date on where Mr. Syed is. He's actually in India with his American citizen children who are middle school age, who are all now because the family has no assets. And I think this issue of restitution, which we did raise in our brief, I didn't argue it here because of my time, is very important. These judgments, these forfeiture orders and some restitution orders, create an incredible burden on individuals to be able to operate once they've completed their sentence. Now, I don't know what will happen in the future. Mr. Syed is a relatively young man. If this current administration continues, he's not coming back. Maybe someday in the future there will be an opportunity for him to come back. His children, who are Americans, who were born here and raised here, desperately want to come back. But when he comes back, and if he does come back, he'll be burdened with this forfeiture order, which is very interesting because in this case there's no restitution. Because in this case there's no finding that the school construction authority was injured in any way. They got the benefit of payments that were being made. Sorry, they got the benefit of the building. It was Mr. Nadine and the others who were actually not paying their employees what they were saying they were paying them. Mr. Syed did not receive any benefit from this other than his job, as Mr. Rowley pointed out. We pointed out in our brief that the government tried to make it seem like he earned at least $5,000. But in fact, the evidence showed that they never followed up on that $5,000 to see where it came from and where it went. Did Judge Kogan consider the possibility of restitution instead of forfeiture or in addition to forfeiture? Again, I wasn't there. My recollection, though, is that he did not because no one lost money other than, I guess, some class of union people who may have had this job, but they weren't coming forward as making victim statements. Thank you very much.